IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ALAN L. SCHRODER,

    Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

No. C05-3026-PAZ

**MEMORANDUM OPINION AND ORDER**

## *I. INTRODUCTION*

The plaintiff Alan L. Schroder ("Schroder") seeks judicial review of a decision by an administrative law judge ("ALJ") denying his application for Title II disability insurance ("DI") benefits. Schroder claims the ALJ erred in asking an improper hypothetical question of the Vocational Expert, failing to analyze his subjective complaints properly, and determining he can make the vocational adjustment to work that exists in sufficient numbers in the economy. (*See* Doc. No. 9)

## *II. PROCEDURAL AND FACTUAL BACKGROUND*

### *A. Procedural Background*

On June 20, 2001, Schroder protectively filed an application for DI benefits, alleging a disability onset date of April 1, 1995.[1] Schroder claims he is disabled due to asthma, emphysema, arthritis, hearing problems, curvature of the spine, disc damage, and

---

[1] The record also contains documentation relating to two previous applications for DI benefits, filed April 16, 1996 (R. 85-89), and October 28, 1998 (R. 95-97). Both of Schroder's prior applications were denied (*see* R. 34-36, 39A-54). At the hearing on Schroder's current application, the ALJ clarified that despite the earlier denials, he could, and would, consider evidence regarding whether Schroder was disabled prior to his date last insured of September 30, 1997. (*See* R. 473-75)

chronic gastritis. He claims these conditions prevent him from working full time because of pain and discomfort when he tries to lift anything, drive a tractor, or do any farm work. Schroder's applications were denied initially and on reconsideration.

Schroder requested a hearing, and a hearing was held before ALJ Andrew T. Palestini on September 3, 2003. Schroder was represented at the hearing by attorney Gary Groves. Schroder testified at the hearing, and Vocational Expert ("VE") Bill Asenjo also testified.

On March 23, 2004, the ALJ ruled Schroder was not entitled to benefits. Schroder appealed the ALJ's ruling, and on April 8, 2005, the Appeals Council denied Schroder's request for review, making the ALJ's decision the final decision of the Commissioner.

Schroder filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On February 24, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. Schroder filed a brief supporting his claim on August 1, 2005. The Commissioner filed a responsive brief on September 2, 2005. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Schroder's claim for benefits.

### *B. Factual Background*

*1.   Introductory facts and Schroder's hearing testimony*

Schroder was born in 1947, on a farm near Blairsburg, Iowa, the town where he still resides. When he was a teenager, he was diagnosed with scoliosis, and he sought evaluation and treatment at the Mayo Clinic in Rochester, Minnesota. At age sixteen or seventeen, Schroder began wearing a brace that went from his hips up to his neck. He wore the brace throughout his senior year in high school, in preparation for surgery the following summer. However, when he returned to the Mayo Clinic that summer, a different doctor had taken over his case and the doctor recommended waiting until the fall

2

of 1966 for the surgery. According to Schroder, doctors told him that after the surgery, he would be "out of commission for eight months," and permanently unable to bend. Schroder apparently discontinued wearing the brace at that time, and he never had the surgery.

Schroder graduated from high school. He always planned to work on the family farm, and he never attempted to obtain any further education after high school. He worked on the family farm for awhile, and he also raised cattle from 1964 to 1974. Although he had some difficulty performing all the duties of farming and raising cattle, he managed to do what was necessary, including lifting new calves, harvesting crops, and carrying up to 100 pounds. During this time period, he took Tylenol for pain in his lower back. He was unable to take aspirin because of stomach problems that arose when he was wearing the brace and taking twenty to thirty aspirin per day.

As Schroder got older, into his twenties, his pain began worsening gradually. He noticed cold weather caused him to have more pain. He still had not returned to the Mayo Clinic for surgery because he was afraid the surgery would not be successful. In 1974, Schroder began doing custom hay-cutting for others, using a "windrower" machine. He did not have a baler, so he had to lift the hay bales, and he had to stop and rest during the baling. Schroder's condition continued to worsen gradually and in 1986, he sold off his cattle herd and stopped raising cattle because he no longer was able to feed the cattle or care for the calves. He continued to do planting and cultivating for a few more years, but in 1990, he stopped farming altogether. His father became ill, and due to his own pain, Schroder was unable to care for his father and continue working the farm. He had to lift his father in and out of a wheelchair, bath, and bed, and drive him to doctors' appointments. Schroder's father died in 1995, and then he began caring for his mother, helping her with household chores and other needs. His mother eventually was moved to a nursing home.

In 1991, Schroder began driving a diesel-powered tractor for Dale Graham, a neighbor. Schroder's mother agreed to lease farm land to Graham if he hired Schroder to work for him. From 1991 to 1999, Schroder worked 150 to 200 hours per year for Graham, and he was paid $5.00 an hour for the work. On a typical day, Schroder worked from 10:00 a.m. to 6:30 p.m. Graham allowed him to rest as needed on the job, and Schroder often took breaks up to two hours long when he would go home and lie down or walk around in an attempt to alleviate his back pain. Schroder had trouble using Graham's equipment, and he was unable to do the work in a way that was satisfactory to Graham. In a work assessment dated October 11, 1998, Graham indicated Schroder was clumsy, accident-prone, "not mechanicaly [sic] minded," had poor judgment, and required supervision. Schroder quit working for Graham because riding on the tractor over the rough ground became too painful. In addition, Schroder has asthma, and he could not keep enough asthma medication with him on the tractor to allow him to breathe well. Schroder indicated the only reason he worked for Graham was his mother's leasing arrangement, and otherwise he would not have worked at all. He did not believe he could work a full eight-hour day and give a good effort.

During the time he worked for Graham, Schroder had five horses that he cared for. He stacked bales of hay, weighing from sixty to 100 pounds each, in the barn for the winter. He stated he could not stack more than ten bales a day. He cleaned the horses' stalls, and brushed and curried the horses. He wore a mask when he cared for the horses to prevent horsehair from getting into his lungs. He sold his horses in the spring of 2003, because he was not able to continue caring for them.

Schroder first filed an application for disability insurance benefits in 1996. He stated he did not want to file the application because he is proud and did not want to take money from the government, but others urged him to file the application. His application was denied, and he did not ask for an ALJ hearing because he decided he had done enough

to satisfy the people who were urging him to seek benefits.  He applied again in 1998 and 2000, again at the urging of his family and doctors.  Schroder stated he would much rather work than be considered disabled.  He indicated that in the past, he had exaggerated somewhat when he responded to doctors' questions about his functional abilities because he is proud and does not want to be considered disabled.  He often would make it appear that his condition was better than it actually was.

Schroder stated that in 1997, he could not lift even as much as ten pounds without pain.  On his job working for Graham, he had to lift seed corn and seed beans and carry them for five to ten feet.  He did the lifting in spite of the pain it caused because he was proud and wanted to work.  He could only stand for about forty-five minutes before he would have to lean on something or sit down for about half an hour to rest his back.  He could walk around to relieve his back pressure, but then he would have breathing problems and have to sit down to catch his breath.  He could walk the length of a football field but he would be very short of breath and exhausted after walking that far.  His hearing was impaired in his left ear, and he was beginning to notice balance problems.  He had difficulty stooping, climbing, kneeling, and crawling.  Schroder stated he could not have held a full-time job in 1997, because he would have had to take off three to four days per month because of his physical problems.

Schroder indicated he began suffering from asthma and emphysema back in the 1980s.  He uses an inhaler for his asthma.  When he was farming, the dust and fumes caused his asthma to worsen.  He wore a mask that helped some, but he still had breathing problems and he became fatigued easily.  He was susceptible to pneumonia and was treated for pneumonia once or twice a year.

By the time of the ALJ hearing in September 2003, Schroder's pain had worsened considerably, and he was receiving regular cortisone shots for pain.  He indicated that back in 1997, he only took Tylenol for pain.  According to Schroder, doctors wanted to

prescribe stronger pain medications, but he did not want to take anything that would slow him down or upset his stomach. In addition to his back pain, he also had frequent headaches. He learned later, in 1998, that he has nerve damage in his ear that causes him dizziness and light-headedness.

Schroder indicated that his physical problems and the resulting limitations have caused him to feel depressed and melancholy, and to have difficulty concentrating. He had concentration difficulties when he was working for Graham, and he had several accidents as a result. He tipped over a truck and spilled grain on one occasion, and he hit fences with the tractor on occasion. He knows of no other farmers would who have allowed him to work for them.

### 2.     *Schroder's medical history*

Because Schroder must show he was disabled prior to September 30, 1997, his date last insured, the court will focus on his medical history prior to that date. The record indicates Schroder was first seen at the Mayo Clinic on June 17, 1963, "because of a high thoracic scoliosis with concavity to the left." (R. 216) His spinal growth was not yet fully complete, and doctors determined it would be wise to wait a few months before deciding on a course of treatment. At this time, doctors also did not believe use of a "Risser jacket" (a type of brace) was advisable, although they felt the Risser jacket would be warranted prior to any corrective surgery.

Schroder returned for further evaluation on October 10, 1963. His spinal curvature had not changed appreciably since his June visit. Doctors were reluctant to advise surgery unless they could offer Schroder significant correction. They advised him to try a one-half inch lift in his right shoe, and to return for follow-up in three months. He returned to the clinic on December 27, 1963, and doctors noted positive changes in Schroder's posture due to the lift in his right shoe. Notes indicate Schroder was diligent in performing

scoliosis exercises and stretches. He was advised to return for follow-up during the summertime.

Schroder was seen at the clinic again on June 26, 1964. Notes indicate he "was doing his scoliosis exercises and working on the farm without too much trouble with his back; and when he stood straight with good posture, his back deformity was not very obvious." (R. 214) Because Schroder was not experiencing significant difficulties, doctors again recommended he not undergo surgery, and return for follow-up in a few months. He returned to the clinic in December 1964, when a different doctor saw him for orthopedic consultation. New x-rays showed some progression of Schroder's scoliosis, and he was placed in a "Milwaukee Brace," with a plan to reconsider possible spinal fusion after maximum correction had been obtained from the brace. No further records from the Mayo Clinic are included in the administrative record.

Schroder's family doctor is Joseph X. Latella, D.O. Dr. Latella treated Schroder for coughs, asthma, bronchitis, shortness of breath, chest pain, and pneumonia beginning at least as far back as July 1995. The record indicates Schroder was diagnosed with pneumonia in July 1995, and again in March 1996, when he was hospitalized for three days. After his release from the hospital, Schroder was treated with inhalers and steroids. Notes also indicate Schroder complained that he was unable to do much work due to arthritis, and hard labor made him short of breath. Dr. Latella noted Schroder exhibited "[a]udible wheezing on exertion." (R. 225) Allergy testing in May 1996 was negative, although Dr. Latella noted Schroder's asthma/bronchitis had "environmental farm etiology." (*Id.*)

While Schroder was in the hospital in March 1996, he complained of hip and back pain, and x-rays were taken of his right hip and lumbosacral spine. The films showed mild to moderate degenerative disc disease at L3-4; mild to moderate osteoarthritis of his right

7

hip; and moderate to marked complex thoracolumbar rotoscoliosis with associated osteoarthritis.

On June 5, 1996, Dr. Latella wrote a letter to Disability Determination Services. He indicated Schroder's lumbar spine flexion was limited to forty-five degrees, extension to ten degrees, and side bending to ten degrees bilaterally. The doctor recited the findings from the March 1996 x-rays of Schroder's hip and spine. He noted Schroder could move, sit, and kneel, but he could not perform constant bending, crawling, and climbing.

On June 28, 1996, Lawrence Staples, M.D. reviewed the record and completed a Residual Physical Functional Capacity Assessment form regarding Schroder. Dr. Staples noted Schroder was claiming disability on the basis of "arthritis and emphysema." (R. 254) He opined Schroder could lift twenty pounds occasionally and ten pounds frequently; stand or walk for about six hours in an eight-hour workday; sit for less than six hours in an eight-hour workday; and push/pull without limitation. He opined Schroder could perform all types of postural activities on an occasional basis, and he found Schroder would have no manipulative, visual, communicative, or environmental limitations.

Schroder sought treatment in August 1996, for pain in his left shoulder and wrist. He was diagnosed with tendinitis of the left wrist, and bursitis of the left shoulder. He was treated with injections and received a prescription for an anti-inflammatory drug.

Beginning September 10, 1996, Schroder sought treatment for several weeks for gastric symptoms including nausea, belching, loss of appetite, diarrhea, and abdominal pain. He was diagnosed with a gastric ulcer. He was treated with Propulsid, Maalox, and Prevacid. His symptoms improved, and by November 18, 1996, he reported all of his symptoms were much better. There is no indication he sought further medical treatment until October 28, 1997, when he received a flu shot, followed by a pneumonia shot on November 3, 1997.

On December 16, 1997, Schroder's right elbow, left radius and ulna, and left shoulder were x-rayed to evaluate his claims of pain in those areas. The films showed

small osteophytes arising from his right elbow area, with a possible diagnosis of bursitis, and mild osteoarthritic changes in his left acromioclavicular joint. Schroder's shoulder remained painful throughout December 1997. He was treated with Iontophoresis, anti-inflammatory drugs, and Prednisone. His symptoms appear to have resolved, as he did not complain of further shoulder or elbow pain during several visits to the doctor in January and February 1998, when he was treated for asthma and COPD. As of January 22, 1998, he reported he was still raising horses, and he cleaned out their stalls once per week, which caused him shortness of breath.

In early April 1998, Schroder saw Leopoldo E. Delucca, M.D. for consultation in connection with Schroder's complaints of "progressive left-sided roaring-type tinnitus; at first sporadic but now constant, as well as numbness between the left eye and the left jaw and occasional positional and exertional unsteadiness without frank rotatory vertigo." (R. 269) Dr. Delucca noted Schroder's past medical history was "positive for 'farmer's lung' with asthma and COPD." (*Id.*) Schroder told Dr. Delucca's nurse that he was "becoming increasingly forgetful and [had] to have his mother help him remember things." (R. 270) Dr. Delucca's testing indicated Schroder had "a markedly asymmetric left-sided sensorineural hearing loss," and he ordered an MRI for further evaluation. (R. 269) The MRI of Schroder's brain and internal auditory canals, performed on April 10, 1998, was normal. (R. 273)

On May 5, 1998, Schroder saw Jugal T. Raval, M.D. for review of an MRI scan of Schroder's lumbar spine. Dr. Raval indicated the MRI scan was "severely abnormal" and "showed marked rotoscoliosis of the thoracolumbar spine, . . . [with] hypertrophy of the facet joint at almost all levels and compression on the thecal sac and diffuse narrowing of the spinal canal." (R. 263) He recommended Schroder see an orthopedic surgeon or neurosurgeon for further evaluation. Dr. Raval directed Schroder to avoid any heavy lifting.

9

The record contains no further evidence of Schroder's condition for the time period before and immediately after September 1997. Medical records from early 1998 through September 2003 indicate that over time, Schroder's condition continued to worsen, both due to his scoliosis and due to his asthma, COPD, and emphysema. On September 25, 2003, Dr. Latella wrote a letter to Schroder's attorney in which the doctor noted he is a Disability Determination Services examiner for the State of Iowa, he has treated Schroder for over twenty years, and he is "appalled that this man has not been put on disability." (R. 463) He opined Schroder's life expectancy has been severely limited because of his many physical problems. He further opined Schroder had "not been able to [d]o any work since approximately 1996 when the pathology from the rotoscoliosis, emphysema and asthma became intolerable for him to do anything but take care of his daily sedentary life style." (*Id.*) Dr. Latella explained that Schroder's shortness of breath "is related to the shift of the spine to the left side of his body making his heart beat irregular at times." (*Id.*) He noted that during the year preceding his letter, Schroder had been receiving injections to his lumbar spine to treat pain due to sciatic neuralgia.

### 3. *Vocational expert's testimony*

The ALJ asked the VE to consider what effect it would have on Schroder's ability to work if he had the following limitations: lift twenty pounds occasionally and ten pounds frequently; stand or walk in combination up to six hours per day; sit up to six hours; occasionally bend, squat, crawl, climb, push, or pull; and avoid excessive dust, fumes, pollutants, and other irritants. The VE stated with those limitations, Schroder possibly could have returned to work as a farmhand or tractor operator, depending on how much he would be exposed to dust. The ALJ clarified that exposure to allergens and chemicals also would be problematic, and with this added limitation, the VE indicated Schroder would be unable to return to his past work.

However, considering that Schroder was a younger individual prior to September 24, 1997, closely approaching advanced age, with a high school education, the VE indicated there would be several light, unskilled occupations he could perform. The VE gave examples of shredder or caponizer, in the agricultural area, and indoor jobs including small parts assembler or inspector/hand packager. The VE indicated all of these jobs exist in sufficient numbers in both the local and national economies.

The ALJ next asked the VE to consider the same individual, but with the limitation that he could only sit for one-half hour at a time before changing positions; stand up to forty-five minutes before having to sit; drive no more than thirty-five miles at a time; and lay on the floor for twenty to twenty-five minutes to relieve back pain after being active for a few hours. The VE stated with these limitations, Schroder would be unable to perform any type of work.

### 4. *The ALJ's decision*

The ALJ found Schroder has not engaged in substantial gainful activity at any time relevant to this case, and he met the disability insured status requirements through September 30, 1997.

The ALJ found Schroder to have the following medically-determinable impairments: "Moderate to marked levorotoscoliosis with associated osteophytosis; mild to moderate degenerative disc disease, L3-4; mild to moderate osteoarthritis of the right hip; asthma; and gastroesophageal reflux disease." (R. 22) He further found that one or more of these impairments impose significant limitations on Schroder's ability to function in the workplace. However, he found Schroder's impairments, singly or in combination, do not reach the Listing level of severity.

The ALJ found Schroder's subjective complaints of a complete inability to work not to be fully credible. The ALJ noted Schroder had gone for long periods of time without

seeking medical care, noting a failure to seek medical care diligently "tends to suggest tolerable symptomatology." (R. 23) He also found it significant that even after Schroder's date last insured, he continued to engage in farm activities such as caring for horses, cleaning out stables, and putting up hay. The ALJ found these activities suggested "a residual capacity at odds with a finding for disability." (R. 24) Further, the ALJ found, based on Schroder's earnings for a fifteen-year period, that his "poor work history detracts from a finding that disability was the cause of his not working." (*Id.*)

The ALJ found Schroder to have the following residual functional capacity for the period in question: lift and/or carry up to twenty pounds occasionally and ten pounds frequently; sit, stand, and/or walk up to six hours in an eight-hour day; occasionally bend, squat, crawl, climb, push, and/or pull; and avoid excessive exposure to dust, fumes, pollutants, irritants, and allergens.

The ALJ gave no weight to Dr. Latella's statements in 2002-2003 that Schroder is disabled. The ALJ noted the disability determination is reserved to the Commissioner of Social Security. In addition, he found Dr. Latella's statements to be inconsistent with the doctor's statements during the relevant period.

The ALJ found that Schroder would not have been able to return to his past relevant work during the relevant period. However, relying on the VE's testimony, the ALJ found Schroder could have performed a variety of jobs within his functional limitations, including shredder, shaver, caponizer, small parts assembler, and inspector/hand packager, all of which exist in sufficient numbers in the local and national economies. The ALJ therefore concluded Schroder was not disabled prior to the expiration of his insured status.

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

17

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Schroder argues the ALJ erred in several respects. He argues the ALJ failed to analyze his subjective complaints properly under the *Polaski* standard. He maintains the ALJ failed to consider his testimony that he frequently under-reported the severity of his symptoms to his doctors because of his pride and his inability to accept his disability. He further argues the ALJ failed to consider his testimony that he over-used aspirin for years to relieve his pain and maintain his level of daily activity, to the point that he "was

18

suffering from extreme epigastric discomfort" by 1996. Schroder also argues the ALJ improperly determined he retained the residual functional capacity to perform work other than farming during the relevant period. Schroder notes he saw a doctor fourteen times between January and December 1996, and he was hospitalized for three days. The record indicates Schroder continued to seek treatment for breathing difficulties and bursitis. Further, although Schroder did not seek treatment for his scoliosis, the record conclusively establishes that he has serious scoliosis that will never resolve on its own, and might not resolve even with surgical treatment. Dr. Latella has explained that Schroder's scoliosis is the cause of his breathing difficulties and results in serious functional limitations.

The court finds the record contains substantial evidence that Schroder would have to miss work three or more days per month due to the severity of his symptoms. The record also supports Schroder's claim that he must change positions after sitting for one-half hour, and he has to lie down for twenty minutes or more after only a few hours of activity to relieve his back pain. When presented with a hypothetical question including these limitations, the VE testified Schroder would be unable to perform any type of work. The court agrees. As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). The court finds the record does not contain substantial evidence to support the ALJ's conclusion that Schroder has the requisite physical capacity to work.

## V. CONCLUSION

Accordingly, for the reasons discussed above, judgment will be entered in favor of Schroder[2] and against the Commissioner, and this case is **reversed and remanded** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 11th day of May, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[2]**Note to plaintiff's counsel:** The plaintiff's counsel must comply with the requirements of Local Rule 54.2(b) in connection with any application for attorney fees.